UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Yalcin Ayasli

     v.

Sezgin Baran Korkmaz, Kamil Feridun
Ozkaraman, Fatih Akol, SBK Holdings A.S.,
SBK Holdings, USA, Inc., Bugaraj Elektronik
Ticaret ve Bilisim Hizmetleri A.S., and
Mega Varlik Yonetim, A.S.

Civil No. 19-cv-183 -JL
Opinion No. 2020 DNH 131

## **MEMORANDUM ORDER**

Several motions to dismiss the plaintiff's claims against defendants in this civil

action brought under the Racketeer Influenced and Corrupt Organizations Act (RICO)

turn on whether this court may exercise personal jurisdiction over non-resident

defendants under (i) New Hampshire's long-arm statute, N.H. Rev. Stat. Ann. § 510:4,

(ii) RICO, 18 U.S.C. § 1965, or (iii) Federal Rule of Civil Procedure 4(k)(2), often

referred to as the "federal, long-arm" rule.  And whether the court dismisses the action

entirely or transfers it to one or more other jurisdictions depends on whether the plaintiff

has carried his burden of demonstrating that the case could have been brought in those

jurisdictions.

Plaintiff Yalcin Ayasli, a New Hampshire resident, claims that the defendants

engaged in a conspiracy to devalue his Turkish airline, BoraJet, purchase it at the

devalued price, and file lawsuits in Turkey, all for the alleged purpose of extorting him.

Ayasli brings civil RICO, conspiracy, and New Hampshire Consumer Protection Act

claims against seven defendants:  Sezgin Baran Korkmaz; two corporations in which
Korkmaz has an interest: SBK Holdings Anonim Sirketi ("SBK Holdings") and Bugaraj
Elektronik Ticaret ve Bilisim ("Bugaraj"); SBK Holdings, USA, Inc.; Mega Varlik
Yonetim Anonim Sirketi ("Mega Varlik"); BoraJet's former general manager, Fatih
Akol; and an associate of Korkmaz, Kamil Feridun Ozkaraman.  He also brings a claim
for fraudulent misrepresentation during the sale of BoraJet against the individual
defendants (Korkmaz, Akol, and Ozkaraman), as well as against Korkmaz's companies,
SBK Holdings and Bugaraj.  Finally, Ayasli asserts claims for defamation and intrusion
of privacy against Korkmaz alone.

This court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 (federal
question), 1332 (diversity), and 1367 (supplemental jurisdiction), as well as under
18 U.S.C. § 1964 (RICO).  Korkmaz, SBK Holdings, Bugaraj, Akol, and Mega Varlik[1]
challenge this court's personal jurisdiction over them, however, and move to dismiss the
claims against them on that basis.  See Fed. R. Civ. P. 12(b)(2).  These defendants also
argue that the clause of the BoraJet sale agreement selecting Turkey as the forum for
litigation arising from that agreement mandates dismissal of this case and, even if it does
not, that this case must be dismissed under the doctrine of forum non conveniens.

---

[1] The court refers in this order, as the parties have in their briefing, to Korkmaz, SBK Holdings,
and Bugaraj collectively as "the Korkmaz defendants."  It refers to all five of these defendants
collectively as "the moving defendants."  The remaining two defendants, SBK Holdings USA
and Ozkaraman, have defaulted.

**Personal jurisdiction**.  Ayasli has failed to establish that any of the moving defendants possess the minimum contacts with New Hampshire required for this court to exercise personal jurisdiction over them in this action.  First, he has failed to establish the requisite minimum contacts for this court to exercise personal jurisdiction under this state's long-arm statute and the Fourteenth Amendment's Due Process Clause.  The RICO Act also requires Ayasli to establish at least one defendant's minimum contacts with New Hampshire before this court can exercise personal jurisdiction over the defendants, and Ayasli has not done so as to any defendant in this case.  Finally, Ayasli has failed to certify that the defendants are not subject to personal jurisdiction in any other district, as he must for this court to exercise personal jurisdiction under Rule 4(k)(2).  And because the court agrees with the moving defendants that it lacks personal jurisdiction over them, it does not reach their forum-selection-clause, forum non conveniens, or Rule 12(b)(6) arguments.

**Motions to dismiss on other grounds**.  All of the moving defendants also seek dismissal on forum non conveniens grounds and defendant Akol further argues that Ayasli has failed to state a claim against him.  Thought the defendants are correct that the court may elect to dismiss an action under forum non conveniens grounds without addressing personal jurisdiction if considerations of convenience and fairness warrant it, "[i]f . . . a court can readily determine that it lacks jurisdiction over the cause or the defendant, the proper course would be to dismiss on that ground."  Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431, 436 (2007).  Here, the court has

determined that it lacks jurisdiction over the defendants.  It therefore may not, and does not, address the defendants' other proposed grounds for dismissal.

**Transfer**.  Ayasli has, on the other hand, demonstrated that he could have brought this action in the United States District Court for the Central District of California because that court may exercise jurisdiction over most of the defendants, including Akol and the Korkmaz defendants.  And because it is in the interest of justice to transfer this action rather than dismissing it outright, the court grants Ayasli's transfer motion in part. He has not, however, made the requisite showing with respect to Mega Varlik, and so the court dismisses his claims against that defendant.

## I.    Applicable legal standard

"Personal jurisdiction implicates the power of a court over a defendant.  In a federal court, both its source and its outer limits are defined exclusively by the Constitution."  Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 143–44 (1st Cir. 1995) (citing Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982)); U.S. Const. amends. V, XIV, § 1 (prohibiting the federal government and states from "depriv[ing] any person of life, liberty or property, without due process of law").  "[T]he jurisdictional analysis depends upon whether any statute or rule authorizes the forum court to exercise its dominion over the defendants, and if so, whether the court's exercise of that jurisdiction would comport with due process." United States v. Swiss Am. Bank, Ltd. ("Swiss I"), 191 F.3d 30, 35–36 (1st Cir. 1999).

Ayasli, as the party invoking this court's jurisdiction, bears the burden of "proffer[ing] evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction."[2]  A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016) (quoting Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008)).  "To satisfy that standard, a plaintiff may not rest on mere allegations but, rather, must submit competent evidence showing sufficient dispute-related contacts between the defendant and the forum."  Carreras v. PMG Collins, LLC, 660 F.3d 549, 552 (1st Cir. 2011).  The court "view[s] this evidence, together with any evidence proffered by the defendant[s], in the light most favorable to the plaintiff and draw[s] all reasonable inferences therefrom in the plaintiff's favor," albeit without "credit[ing] bald allegations or unsupported conclusions."  Id.

## II.   **Background**

Ayasli contends that the events giving rise to this action began in 2010, when Korkmaz and a few associates not party to this action—Jacob Kingston, Isaiah Kingston, and Lev Aslan Dermen—"devised an elaborate scheme to fraudulently obtain fuel tax

---

[2] With respect to the long-arm-statute analysis, the district court may evaluate personal jurisdiction under one of three standards.  See A Corp., 812 F.3d at 58 & n.5.  The parties have proceeded under the prima facie standard here.  See Opp. to Korkmaz Defendants' Mot. to Dismiss (doc. no. 23) at 12–13 (invoking prima facie standard); Korkmaz Defendants' Reply in Supp. of Mot. to Dismiss (doc. no. 26) at 7–10 (not invoking any other).  Under that standard, the plaintiff needs make only a prima facie showing that defendants are subject to personal jurisdiction.  This is "the least taxing of these standards from a plaintiff's standpoint, and the one most commonly employed in the early stages of litigation."  A Corp., 812 F.3d at 58 n.5 (quoting Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 83–84 (1st Cir. 1997)).

credits from the U.S. Treasury and launder the proceeds."[3]  As part of that scheme, he

contends, these alleged co-conspirators created two business entities—defendants

SBK Holdings and SBK Holdings, USA—through which they moved fuel and laundered

money until 2018.[4]

    While this alleged tax-credit conspiracy was occurring, a political coup attempt

took place in Turkey on July 15, 2016.  Turkish authorities believed the coup to be the

work of an exiled cleric, Fethullah Gulen, and an organization of his followers that

Turkish authorities call Fettullahci Teror Orgutu ("FETO").[5]  In the wake of the

attempted coup, Turkish authorities imprisoned thousands of individuals believed to be or

suspected of being connected to FETO.[6]  Not long thereafter, a series of columns

appeared in Turkish newspapers alleging a connection between Ayasli and FETO.[7]

---

[3] Opp. to Korkmaz Defendants' Mot. to Dismiss at 4.

[4] Id.  The Kingstons pleaded guilty to charges of mail fraud, money laundering, and filing false tax statements in connection with their renewable-fuel-tax-credit scheme between 2010 and 2018.  See Miller Decl. Ex II-C at Opp. to Korkmaz App. 179–80.  Dermen was convicted of conspiracy and money laundering in connection with this scheme on March 16, 2020.  Korkmaz was identified as an unindicted coconspirator in that case.  See Miller Decl. Ex. II-K at Opp. to Korkmaz App. 321.  Citations to "Opp. to Korkmaz App." refer to the appendix attached to the plaintiff's opposition to the Korkmaz defendants' motion to dismiss (doc. nos. 23-1, 23-2, and 23-3).

[5] This is also the term that the parties employ in the complaint and their papers, and which the court adopts for the sake of consistency.

[6] E.g., Miller Decl. Ex. II-Q at Opp. to Korkmaz App. 415.

[7] Turkish newspapers published four articles between September 23, 2016 and August 17, 2017 allegedly connecting Ayasli to FETO and the failed coup.  See Ayasli Decl. Exs. I-B, I-C, I-D, I-E at Opp. to Korkmaz App. 53–71.

Ayasli claims that these newspaper columns appeared as part of a plot between Korkmaz, the Kingstons, and Dermen to devalue and take over his airline in Turkey.[8]  At the time of the coup, Ayasli owned a small, regional airline in Turkey called BoraJet.  Ayasli alleges that, in April 2016, "a financial consulting firm valued BoraJet between $355 million USD and $865 million USD."[9]  By October, however, BoraJet's ridership fell and it lost an alliance with Turkish Airlines.  Ayasli transferred $27 million from accounts based in New Hampshire to keep the airline afloat.[10]  And that, Ayasli asserts, is when Korkmaz "appeared as a 'white knight'," offering to purchase BoraJet.[11]

Defendant Akol, as chairman of BoraJet's board of directors, negotiated the sale to another of Korkmaz's companies, defendant Bugaraj, which Ayasli claims he agreed to "under extreme financial duress" and "desperate to stop hemorrhaging money."[12]  Under the sale agreement, Ayasli agreed to assume certain of BoraJet's financial obligations, which he agreed to repay within one year.[13]  Shortly after the sale, however, BoraJet defaulted on some of its financial obligations and cancelled its flight operations.[14]  Ayasli

---

[8] Compl. (doc. no. 1) ¶¶ 324–35.

[9] Opp. to Korkmaz Defendants' Mot. at 3 (citing Compl. ¶¶ 292–93).

[10] Compl. ¶ 392.

[11] Id. ¶ 398.

[12] Id. ¶¶ 399–404.  Ayasli alleges that Korkmaz bribed and/or threatened Akol to reject a more favorable offer in favor of his own.  Id. ¶¶ 397, 399–401.

[13] Id. ¶¶ 411–12.

[14] Id. ¶¶ 419, 421.

alleges that Korkmaz then (1) accused him of failing to make certain required disclosures about BoraJet; (2) attempted to attach Ayasli's real property; (3) influenced banks to close BoraJet's credit lines and demand repayment of loans that Ayasli had personally guaranteed; and (4) ultimately forced Ayasli to spend $7 million and seek financing of $21 million to pay off those loans.[15]

Mega Varlik, an asset-management company in Turkey, purchased one of those loans after the bank that issued it, Odea Bank, initiated legal proceedings to collect on it.[16]  Ayasli unsuccessfully sued Mega Varlik and Odea Bank in Turkey, challenging the loan transfer on grounds similar to those raised in Ayasli's complaint here.[17]

The Korkmaz defendants filed three commercial cases and three criminal complaints against Ayasli and his associates in Turkish courts in connection with the BoraJet sale.[18]  Ayasli contends that Korkmaz is using these "sham" litigations as "leverage to extort a monetary 'settlement' from" him.[19]  Between February 25, 2017, and June 15, 2018, Korkmaz sent Ayasli a series of WhatsApp messages[20] and called his

---

[15] Id. ¶¶ 8, 423–47.

[16] Declaration of Çalğar Şendil in Supp. of Mega Varlik's Mot. to Dismiss ("Şendil Decl.") (doc. no. 47-2) ¶¶ 4, 6–7.

[17] Id. ¶¶ 8–10.

[18] Compl. ¶ 463.

[19] Opp. to Korkmaz Defendants' Mot. to Dismiss at 10; Compl. ¶¶ 465–67

[20] WhatsApp is an application used to send and receive messages through smartphones and tablets over data or Wi-Fi.  For all relevant purposes here, a WhatsApp message is similar to a text message.  Parties can also initiate phone calls over WhatsApp.  E.g., WhatsApp.com, FAQs:

mobile phone seeking settlement of those litigations.[21]  Korkmaz's counsel in New York

mailed a demand letter to Ayasli seeking settlement of those cases on October 4, 2017,

and Korkmaz himself travelled to New Hampshire on April 9, 2018 to discuss a potential

settlement.[22]  Though Ayasli initially agreed to the meeting, he ultimately declined to

attend.  In February 2018, Korkmaz also visited University of Utah professor Dr. Hakan

Yavuz, who had attempted to clear Ayasli's name in Turkey, to pressure him to convince

Ayasli to settle those lawsuits.[23]

        Ayasli then filed this action on February 18, 2019, alleging a conspiracy among

the various defendants to devalue BoraJet and take financial advantage of Ayasli as

described above.  The Korkmaz defendants, Akol, and Mega Varlik have moved to

dismiss Ayasli's complaint for, among other things, lack of personal jurisdiction.  And

for the reasons discussed below, after hearing oral argument and considering the parties'

extensive submissions, the court concludes that it lacks personal jurisdiction over these

moving defendants.

---

Is it free to send messages over WhatsApp? https://faq.whatsapp.com/general/account-and-profile/is-it-free-to-send-messages-over-whatsapp (last accessed July 7, 2020).

[21] Ayasli Decl. ¶¶ 3–7 at Opp. to Korkmaz App. 1–3; Ayasli Decl. Ex. I-A at Opp. to Korkmaz App. 10–52.

[22] Ayasli Decl. ¶¶ 19–20 at Opp. to Korkmaz App.  5; Ayasli Decl. Ex. I-F at Opp. to Korkmaz App. 82–85.

[23] See Yavuz Decl. ¶¶ 11–18 at Consolidated Opp. App. 127–128.  Citations to "Consolidated Opp. App." refer to the appendix attached to the plaintiff's consolidated opposition to Akol's and Mega Varlik's motions to dismiss (doc. nos. 60-1, 60-2, and 60-3).

### III. <u>Personal jurisdiction analysis</u>

Ayasli grounds his jurisdictional arguments in three statutes or rules.  First, he contends that this court may exercise personal jurisdiction over the moving defendants under New Hampshire's long-arm statute, N.H. Rev. Stat. Ann. § 510:4, I.  But because exercising such jurisdiction would not comport with the Fourteenth Amendment's due process requirement, the court may not do so.

Second, Ayasli argues that the civil RICO statute independently authorizes personal jurisdiction over the moving defendants, even if the court would otherwise lack personal jurisdiction under New Hampshire's long-arm statute.  But because Ayasli has not established personal jurisdiction in this court over any of the defendants, the nationwide service-of-process provisions of that statute do not operate to bring Mega Varlik, Akol, or Korkmaz and his corporations within this court's jurisdiction.

Finally, Ayasli invokes Federal Rule of Civil Procedure 4(k)(2), which acts as a federal long-arm statute absent any other basis for personal jurisdiction.  But Ayasli has not certified (and, indeed, cannot certify) that jurisdiction over any of the moving defendants is improper in all other districts, which he must do before this court can exercise personal jurisdiction under that rule.  Therefore, as fully explained below, the court lacks personal jurisdiction over the Korkmaz defendants, Akol, and Mega Varlik.

#### A. New Hampshire's Long-Arm Statute

New Hampshire's long-arm statute authorizes the state's courts to exercise jurisdiction over "[a]ny person who is not an inhabitant of this state and who, in person or

through an agent, transacts any business within this state, commits a tortious act within this state, or has the ownership, use, or possession of any real or personal property situated in this state" with respect to "any cause of action arising from or growing out of the acts enumerated above." N.H. Rev. Stat. Ann. § 510:4, I. This statute "reaches to the full extent that the Constitution allows," such that the court may proceed directly to that familiar due process analysis under the Fourteenth Amendment. Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 287 (1st Cir. 1999).

A court may exercise either general or specific personal jurisdiction over defendants under a long-arm statute. See Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011). Ayasli here argues only specific personal jurisdiction and does not contend that any of the Korkmaz defendants are subject to general personal jurisdiction in this court. Specific jurisdiction "is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." Id. (internal quotations omitted).

Thus, for this court to exercise specific personal jurisdiction consistent with the Fourteenth Amendment's Due Process Clause, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" Bristol-Myers Squibb Co. v. Super. Ct. of Cal., 137 S. Ct. 1773, 1780 (2017) (quoting Goodyear, 564 U.S. at 919). To demonstrate this affiliation and establish the court's specific personal jurisdiction over the defendants, Ayasli must show that:

11

(1) [his] claim directly arises out of or relates to the defendant[s'] forum-state activities;

(2) the defendant[s'] contacts with the forum state represent a purposeful availment of the privilege of conducting activities in that state, thus invoking the benefits and protections of that state's laws and rendering the defendant[s'] involuntary presence in that state's courts foreseeable; and

(3) the exercise of jurisdiction is ultimately reasonable.

Scottsdale Capital Advisors Corp. v. The Deal, LLC, 887 F.3d 17, 20 (1st Cir. 2018).

Ayasli has not made this showing with respect to the Korkmaz defendants, Akol, or Mega Varlik.

## 1.    Korkmaz defendants

Ayasli's arguments in favor of personal jurisdiction over the Korkmaz defendants turns entirely on Korkmaz's own actions.  That is, Ayasli has offered neither argument nor evidence that Bugaraj or SBK Holdings have had any contact with New Hampshire in relation to this lawsuit.[24]  He argues that "Korkmaz's conduct may be imputed to" to those corporate defendants because Korkmaz is their corporate agent.[25]  See United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1090 (1st Cir. 1992) ("The contacts of a corporation's agent can subject the corporation to personal jurisdiction.").  To succeed under this argument, then, Ayasli must demonstrate

---

[24] See Opp. to Korkmaz Defendants' Mot. to Dismiss at 14.

[25] Id.  He also argues that jurisdiction lies in this court under a "conspirator theory" of personal jurisdiction, under which "the acts of [a] conspirator [in a jurisdiction] in furtherance of a conspiracy may be attributed to the other members of the conspiracy." Id. (quoting Textor v. Bd. of Regents, 711 F.2d 1387, 1392 (7th Cir. 1983)).  As explained infra Part III.A.2, that does not appear to be the law in the First Circuit and, in any event, Ayasli has not established personal jurisdiction here as to any defendant.

that at least Korkmaz has the requisite contacts with New Hampshire.  He has not done so.

Ayasli asserts that three actions or series of actions by Korkmaz allegedly give rise to personal jurisdiction in this District under New Hampshire's long-arm statute: (1) an allegedly defamatory media campaign by Korkmaz against Ayasli, (2) allegedly harassing phone calls and text messages from Korkmaz, and (3) Korkmaz's entry into the state in person and by mail in pursuit of settlement.[26]  Though some of these actions may satisfy the relatedness element, none of them amount to the purposeful availment required for this court to exercise personal jurisdiction over Korkmaz or his companies.  The court therefore lacks specific personal jurisdiction over the Korkmaz defendants under New Hampshire's long-arm statute.

### a)      Relatedness

To satisfy the relatedness requirement, a suit must "arise out of, or be related to, the defendant's in-forum activities . . . ."  Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994).  That is, "the defendant's in-state conduct must form an important, or [at least] material, element of proof in the plaintiff's case."  Prairie Eye Ctr., 530 F.3d at 27 (quoting Harlow v. Children's Hosp., 432 F.3d 50, 61 (1st Cir. 2005) (alteration in original)).  The burden is on the plaintiff to "show a nexus between [his] claims and [the defendants'] forum-based activities.  Although this is a 'relaxed standard,' it nevertheless requires [the court] to hone in 'on the relationship between the defendant and the

---

[26] See Opp. to Korkmaz Defendants' Mot. to Dismiss at 16–21.

forum.'"  A Corp., 812 F.3d at 59 (quoting Adelson v. Hananel, 652 F.3d 75, 81 (1st Cir.

2011)).  Ayasli argues that three categories of Korkmaz's actions satisfy this requirement.

Only one of them arguably does so.

      **Harassing messages and calls**.  Ayasli contends that the court can exercise

personal jurisdiction over Korkmaz (and, as a result, the other Korkmaz defendants)

because Korkmaz sent a series of allegedly threatening and harassing messages and calls

through WhatsApp while Ayasli was in New Hampshire.  These messages give rise to at

least Ayasli's invasion of privacy claim against Korkmaz (Count 6) because Ayasli

contends that Korkmaz harassed him through the messages.[27]  See Scottsdale, 887 F.3d

at 21 (forum-related actions must be factual and legal cause of tort claim).

      The relatedness analysis here therefore turns on whether sending messages from

outside of New Hampshire into the state[28] constitutes action in New Hampshire solely

because Ayasli happened to be here when he received them.  To meet the relatedness

requirement, "the action must directly arise out of the specific contacts between the

defendant and the forum state."  Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir. 1995).

And the "transmission of information into New Hampshire by way of telephone or mail is

unquestionably a contact for purposes of [this] analysis."  Id. at 1390.  The First Circuit

Court of Appeals has similarly "[upheld] personal jurisdiction when [a fraudulent] offer

---

[27] Compl. ¶¶ 728.

[28] Ayasli does not dispute that Korkmaz was outside of New Hampshire when he sent those
messages or made those calls.  See Opp. to Korkmaz Defendants' Mot. to Dismiss at 19–21.

is specifically directed from outside of the state to a resident within it . . . ."  First N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 17 (1st Cir. 2009).

 The Korkmaz defendants invoke Walden v. Fiore, 571 U.S. 277, 286 (2014), for the proposition that any harm to Ayasli occurred in New Hampshire solely because of Ayasli's unilateral action of being in New Hampshire, and thus cannot create a relationship between the harm and Ayasli's claims.[29]  But as discussed infra Part III.A.1.b, that part of Walden informs the purposeful availment analysis, not the relatedness element.

 The Korkmaz defendants also argue that the WhatsApp messages do not give rise to Ayasli's RICO claim because the actual harm to Ayasli—the defamatory media campaign, the subsequent takeover of BoraJet, and the allegedly "sham" litigations that followed—occurred outside of New Hampshire.[30]  Were the RICO claim the only claim at issue here, the Korkmaz defendants likely would be correct:  Even if they could arguably constitute but-for causation of his RICO claim, Ayasli has not demonstrated that Korkmaz's WhatsApp messages constitute proximate cause of that claim.  See Scottsdale, 887 F.3d at 21.  But that is not the only claim asserted against Korkmaz.  And, as explained supra, the messages do give rise to Ayasli's invasion of privacy claim in New Hampshire, which the Korkmaz defendants have not challenged.

---

[29] See Korkmaz Defendants' Mem. in Supp. of Mot. to Dismiss at 35.

[30] Korkmaz Defendants' Reply in Supp. of Mot. to Dismiss at 9.

**Media campaign.**  Ayasli next contends that Korkmaz engaged in a media campaign to defame Ayasli in New Hampshire.  Specifically, he contends that Korkmaz directed the publication of four articles in Turkish newspapers alleging Ayasli's connection with FETO.[31]  These allegations, Ayasli argues, injured his and BoraJet's reputations, created financial hardship when BoraJet's ridership fell, devalued BoraJet, and ultimately led to its sale to Bugaraj on terms unfavorable to Ayasli.[32]

Ayasli concedes that Korkmaz was not in New Hampshire when he allegedly directed the publication of these articles in Turkish newspapers in Turkey.  Nevertheless, he invokes the "effects" test employed in the defamation cases Calder v. Jones, 465 U.S. 783 (1984) and Hugel v. McNell, 886 F.2d 1, 3 (1st Cir. 1989) (applying Calder).  He argues that Korkmaz's media campaign is sufficiently "related to" New Hampshire because the articles (1) circulated in the Turkish community in New Hampshire, causing him reputational damage there, and (2) caused financial harm in New Hampshire, where Ayasli and his bank accounts reside.[33]  But as the First Circuit Court of Appeals has observed in the years since Hugel, "Calder addressed purposeful availment, rather than relatedness."  United States v. Swiss Am. Bank, Ltd. ("Swiss III"), 274 F.3d 610, 624 (1st Cir. 2001).  And "[s]ince Calder's 'effects' test is relevant only to the purposeful

---

[31] Ayasli Decl. ¶¶ 9–15 at Opp. to Korkmaz App. 4; Ayasli Decl. Exs. I-B, I-C, I-D, I-E at Opp. to Korkmaz App. 53–71.

[32] Opp. to Korkmaz Defendants' Mot. to Dismiss at 7.

[33] Opp. to Korkmaz Defendants' Mot. to Dismiss at16.

availment prong, it cannot be used to strengthen the [plaintiff's] relatedness showing."
Id.

Because Ayasli claims that the publication of defamatory material injured him
(both as part of the alleged conspiracy and as a stand-alone defamation claim), to
demonstrate relatedness, he must "establish[ ] cause in fact (i.e., the injury would not
have occurred 'but for' the defendant's forum-state activity) and legal cause (i.e., the
defendant's in-state conduct gave birth to the cause of action)."  Scottsdale, 887 F.3d
at 21 (quoting Mass. School of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 35
(1st Cir. 1998)).  To do this, he must offer some evidence that the allegedly defamatory
newspaper articles were "published" in New Hampshire—that is, that the defamatory
material was communicated "to a third party" in New Hampshire, "where that third party
understands the defamatory significance of the material."  Id., (citing Restatement
(Second) of Torts § 558 cmt. c).

Here, the evidence demonstrates that the defamatory articles were written by
Turkish journalists in the Turkish language and published in Turkish newspapers—that
is, newspapers published and circulated in Turkey.[34]  Those articles allegedly concern
Ayasli's activities with respect to Turkish politics.[35]  And, as Ayasli alleges, his injuries
stemmed from the impact of those articles in Turkey:  the lowered confidence in and

---

[34] See Ayasli Decl. ¶¶ 9–15 at Opp. to Korkmaz App. 4; Ayasli Decl. Exs. I-B, I-C, I-D, I-E at
Opp. to Korkmaz App. 53–71.

[35] Id.

devaluation of BoraJet, a Turkish company, and its ultimate sale in Turkey under an agreement which, he contends, led Turkish banks to call in his debts.[36]  This strongly suggests that any reputational damage Ayasli suffered, he suffered in Turkey.

Attempting to relate the publication of those articles to New Hampshire, Ayasli argues that "the Turkish newspapers that published the defamatory articles are widely circulated, available to, and read by people of Turkish descent in New Hampshire."[37]  He alleges, and submits in his declaration, that each of the relevant newspapers makes its content freely available online "and is widely read by people of Turkish descent in New Hampshire and the United States."[38]  But he offers no evidence that anyone in New Hampshire (besides him) has seen or read the allegedly defamatory articles themselves, as relatedness for defamation requires.  See Scottsdale, 887 F.3d at 21–22.  And Ayasli fails to describe any injury caused by damage to his reputation in New Hampshire.  The injuries that Ayasli does assert—the devaluation of BoraJet and Ayasli's efforts to buoy it up, the sale of BoraJet, payment of accelerated loans in Turkey, and defending against litigation in Turkey[39]—arise from damage to his reputation only in Turkey caused by the alleged connection, raised by these articles, between him and a Turkish political element.

---

[36] See Compl. ¶¶ 423–47.

[37] Opp. to Korkmaz Defendants' Mot. to Dismiss at 16–17.

[38] Ayasli Decl. ¶¶ 9–10 at Opp. to Korkmaz App. 4.

[39] Opp. to Korkmaz Defendants' Mot. to Dismiss at 16–17 (enumerating injuries).

Finally, Ayasli argues that his <u>financial</u> injury from the campaign occurred in this State because he paid money out of his New Hampshire bank accounts.[40]  But he offers no support for the argument that the presence of his bank account in the forum satisfies the relatedness element of the due process analysis.  Nor could he.  If the mere location of bank accounts alone conferred jurisdiction, the concept would mean everything and nothing.  The question, as explained <u>supra</u>, is whether any of his <u>claims</u> arise from the defendant's New Hampshire-based defamatory activity; not where Ayasli stores his money.

**Proposed settlement agreement and meeting**.  Ayasli's last relatedness argument hangs on the undisputed fact that Korkmaz's New York counsel mailed a proposed settlement agreement to Ayasli in New Hampshire and that Korkmaz himself travelled once to New Hampshire to discuss settling the Turkish litigation in person (though, in the end, Ayasli declined the meeting).  These contacts with New Hampshire constitute contacts created by the defendant's own actions:  Korkmaz instructed his counsel to send a document into New Hampshire and Korkmaz himself appeared in the jurisdiction.

But as discussed <u>supra</u>, "the defendant's in-state conduct must form an important, or [at least] material, element of proof in the plaintiff's case."  Prairie Eye Ctr., 530 F.3d at 27.  These two contacts with New Hampshire do not form a material element of proof with respect to any of Ayasli's claims against Korkmaz.

---

[40] <u>Id.</u> (emphasizing payment from "his New Hampshire-based accounts").

His defamation claim accrued before these actions took place.  His counsel mailed the proposed settlement agreement to Ayasli around October  4, 2017[41] and visited New Hampshire in an effort to negotiate with Ayasli on April 9, 2018.[42]  But the allegedly defamatory articles giving rise to Ayasli's defamation claim were published well before either of these events, between September 23, 2016, and August 17, 2017.[43]  Ayasli transferred money to ease financial pressure on BoraJet between September and December 2016.[44]  And he sold BoraJet on December 29, 2016.[45]  Korkmaz's proposed settlement agreement and visit to New Hampshire so long after these events cannot have given rise to Ayasli's defamation claims or any injury Ayasli suffered as a result of the allegedly defamatory articles in the form of payments to buoy up BoraJet or its ultimate devaluation and sale.

Nor do the proposed settlement agreement and a single unconsummated visit, allegedly designed to pressure Ayasli into settlement, constitute the "cause in fact (i.e., the injury would not have occurred 'but for' the defendant's forum-state activity) [or] legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action)" of Ayasli's harassment or civil RICO claims.  Scottsdale, 887 F.3d at 21.  Korkmaz sent the

---

[41] Ayasli Decl. ¶ 19 at Opp. to Korkmaz App. 5.

[42] See Ayasli Decl. Ex. I-A at Opp. to Korkmaz App. 28–29.

[43] Ayasli Decl. ¶¶ 12–15 at Opp. to Korkmaz App. 4.

[44] Id. ¶ 16 at Opp. to Korkmaz App. 5.

[45] Compl. ¶ 61.

allegedly harassing WhatsApp messages and calls between February 25, 2017, and

August 6, 2018.[46]  And Korkmaz began pursuing remedies against Ayasli in Turkey in

March of 2017, which Ayasli alleges are "sham . . . cases against [him] and [his]

associates," designed as part of the RICO scheme to obtain additional payments from

Ayasli.[47]  Even were Korkmaz's proposed settlement agreement and unsuccessful visit

designed to further harass or extort Ayasli, his alleged injuries under both claims would

have occurred regardless of these two actions.  And neither of those specific actions

"gave birth" to Ayasli's harassment or civil RICO claims in the sense of proximately

causing those claims.[48]  Accordingly, they cannot establish the relatedness element.

### b)      Purposeful availment

Ayasli has, if only narrowly, carried his burden of demonstrating relatedness as to

the Korkmaz defendants.  The court therefore turns next to the purposeful availment

question.  See Swiss III, 274 F.3d at 624 (The purposeful availment analysis is "to be

applied only after the relatedness prong has already been satisfied.").  The purposeful

---

[46] Ayasli Decl. Ex. I-A at Opp. to Korkmaz App. 11–32.

[47] Ayasli Decl. ¶ 21 at Opp. to Korkmaz App. 6.

[48] The court recognizes the potential appearance of tension between this conclusion and its other conclusion, infra Part V.B.1.b, that Korkmaz's visit to Professor Yavuz in Utah may serve as a jurisdictionally significant predicate act for purposes of Ayasli's RICO claim.  But, unlike his visit to New Hampshire, Korkmaz succeeded in visiting and speaking with Professor Yavuz in the relevant jurisdiction, during which meeting he allegedly conveyed threats in furtherance of the alleged conspiracy's aim to extort a settlement from Ayasli.  The court is not prepared to draw similar conclusions with respect to a meeting that did not actually occur, or to conclude that offering to settle ongoing litigation through a proposed settlement agreement, in and of itself, would rise to the level of a predicate act for a civil RICO claim.

availment element "is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts."  Id.  The plaintiff must therefore demonstrate that the defendant "purposefully availed itself of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable."  Prairie Eye Ctr., 530 F.3d at 28 (internal quotations omitted).  The defendant's contacts must be voluntary, in that his contacts with the forum state must "proximately result from actions by the defendant himself," and not result from "the unilateral actions of another party."  Id. (emphasis original).  They must also be "of a nature that the defendant could reasonably anticipate being haled into court" in the forum.  Id.

Ayasli grounds purposeful availment on the same alleged contacts by Korkmaz with New Hampshire as relatedness:  Korkmaz's (1) defaming media campaign, (2) allegedly harassing phone calls and text messages, and (3) proposed settlement agreement and a single visit to New Hampshire.[49]  None of those contacts satisfies the purposeful availment requirement.

**Media campaign**.  As with his relatedness argument, Ayasli invokes Calder and Hugel for the proposition that the four allegedly defamatory Turkish newspaper articles constitute purposeful availment of this forum by Korkmaz because Ayasli felt the effects

---

[49] See Opp. to Korkmaz Defendants' Mot. to Dismiss at 16–21.

of the defamation in New Hampshire.[50]  And as discussed supra, that "effects test" goes

to the purposeful availment element.  Swiss III, 274 F.3d at 624.

In Calder, the Court found personal jurisdiction in California for a libel claim

arising from a magazine story written by journalists located in Florida.  In that case,

> [t]he allegedly libelous story concerned the California activities of a
> California resident.  It impugned the professionalism of an entertainer
> whose television career was centered in California.  The article was drawn
> from California sources, and the brunt of the harm, in terms both of
> respondent's emotional distress and the injury to her professional
> reputation, was suffered in California.

Calder, 465 U.S. at 788-89.  In short, "California [was] the focal point both of the story

and of the harm suffered" by Calder.  Id. at 789.  Similarly, in Hugel, the Court of

Appeals for the First Circuit concluded that a court in this district could exercise

jurisdiction over out-of-state defendants who provided information to two Washington

Post reporters leading to allegedly defamatory articles in that newspaper.  886 F.2d at 2–

4.  It did so on the basis that the defendants:

> actually directed their actions at a New Hampshire resident[,] . . . knew that
> release of the allegedly false information would have a devastating impact
> on Hugel, and . . . intended the brunt of the injury to be felt in New
> Hampshire where Hugel had an established reputation as a businessman
> and public servant.

4-5.

This case differs in significant respects from both Calder and Hugel.  "The crux of

Calder was that the reputation-based 'effects' of the alleged libel connected the

defendants to California, not just to the plaintiff."  Walden, 571 U.S. at 287.  That is, "the

---

[50] Id. at 17.

'effects' caused by the defendants' article—i.e., the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to California, not just to a plaintiff who lived there." Id. It was "[t]hat connection, combined with the various facts that gave the article a California focus," that "sufficed to authorize the California court's exercise of jurisdiction." Id.

Under Calder, in this case, Turkey would be the clear "focal point both of the story and of the harm suffered" by Ayasli. 465 U.S. at 789. As discussed supra, the articles were published in Turkish newspapers in the Turkish language, allegedly to damage Ayasli's reputation in Turkey. These facts alone point to an intended audience in Turkey. See Noonan v. Winston Co., 135 F.3d 85, 91 (1st Cir. 1998) ("That the advertisement contains French text and a French phone number suggests Lintas:Paris created it for a French audience."). And most importantly, the effects of those articles allegedly manifested in Turkey: BoraJet, a Turkish airline, operated there; it was devalued there; it was sold there; Turkish financial institutions called in Ayasli's debts; and the Korkmaz defendants instituted proceedings against Ayasli in Turkey.[51] As a result, Ayasli has not satisfied Calder's effects test for purposeful availment in the defamation context.

**Harassing messages and calls**. As discussed supra, Ayasli received WhatsApp messages and calls in New Hampshire solely because of his own presence in New Hampshire. He has offered no support for the proposition that phone calls and messages directed to a New Hampshire plaintiff, alone, amounts to purposeful availment of the

---

[51] E.g., Compl. ¶¶ 463–65, 481–82, 485, 488.

forum.  He relies on World Depot Corp. v. Onofri, for the proposition that voluntary

correspondence with residents of a state "can be sufficient to satisfy the purposeful

availment prong."  No. CV 16-12439-FDS, 2017 WL 6003052, at *9 (D. Mass. Dec. 4,

2017) (Saylor, J.).  But in that case, the defendants also solicited business in the forum.

Id.  And the court relied on that solicitation, as well as the voluntary correspondence, to

find purposeful availment.  Id.  The Court of Appeals for the First Circuit has rejected a

finding of purposeful availment when the "[d]efendants' contacts with New Hampshire

. . . were limited to communicating with the [plaintiffs] in their home state" and the

defendants did not solicit the plaintiffs' business.  Sawtelle, 70 F.3d at 1391.  Ayasli does

not claim that Korkmaz solicited his business in New Hampshire.  Korkmaz sent the

WhatsApp messages long after the BoraJet deal was consummated.

Ayasli also relies on cases holding, in effect, that if a party targets another through

actions taken over the internet, that party should expect to be haled into court where the

defendant is located or is most damaged.[52]  In Facebook, Inc. v. ConnectU LLC, for

example, the court concluded that, in the internet era, "specific, targeted conduct may be

'expressly aimed' at a particular individual or entity, despite the fact that the person

engaging in the conduct may not know of the geographic location of the individual or

entity."  No. C 07–01389 RS, 2007 WL 2326090, *5 (N.D. Cal. Aug. 13, 2007)

(emphasis in original).  Accordingly, it found that parties that "specifically targeted their

conduct against Facebook," despite "remaining ignorant of Facebook's precise location,"

---

[52] See Opp. to Korkmaz Defendants' Mot. to Dismiss at 21–22.

had voluntarily submitted to the laws of California.  Id. at *6.  Relying on Facebook, the court in Jones v. Dirty World Entm't Recordings, LLC, similarly concluded that it was "reasonably foreseeable" that commentary on the defendant's website defaming a plaintiff known to be a member of, and in connection with her membership in, the Cincinnati BenGals cheerleading squad would impact the plaintiff, a Kentucky resident, "in the Greater Cincinnati area, which includes Northern Kentucky," and that the defendant could be haled into court in Kentucky.  766 F. Supp. 2d 828, 834 (E.D. Ky. 2011).

And in Verizon Online Servs., Inc. v. Ralsky, the court concluded that "[b]y allegedly transmitting millions of e-mails to make money at Verizon's expense, knowing or reasonably knowing that such conduct would harm Verizon's e-mail servers, Defendants should have expected to get dragged into court where their actions caused the greatest injury," that is, where Verizon's servers were located—in Virginia.  203 F. Supp. 2d 601, 618–19 (E.D. Va. 2002).  These cases, in short, operate to extend Calder's hard-copy-publication effects test into new, internet-based contexts—unsolicited spam email (Verizon and Facebook) and unauthorized access to user data (Facebook).

But Korkmaz's WhatsApp messages implicate neither of these issues.  That is, Korkmaz's messages actions taken over or through the Internet against a plaintiff so much as communications made directly to the plaintiff.  And the First Circuit Court of Appeals has not adopted such a broad approach to purposeful availment.  To the contrary, it has rejected a finding of purposeful availment where, as here, "[d]efendants' contacts with New Hampshire . . . were limited to communicating with the [plaintiffs] in their

home state" and the defendants did not solicit the plaintiffs' business.  Sawtelle, 70 F.3d at 1391.  This is because "the relationship must arise out of contacts that the 'defendant himself' creates with the forum State."  Walden, 571 U.S. at 284 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)) (emphasis in original).

In that vein, "the plaintiff cannot be the only link between the defendant and the forum."  Id.  And while "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties . . . a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."  Id.  See also Phillips Exeter, 196 F.3d at 292 ("Without evidence that the defendant actually reached out to the plaintiff's state of residence to create a relationship—say, by solicitation—the mere fact that the defendant willingly entered into a tendered relationship does not carry the day.").

Ayasli asks the court to focus on the fact that Korkmaz knew that Ayasli lived in New Hampshire when he sent those messages and initiated those calls.[53]  But "[s]uch reasoning improperly attributes a plaintiff's forum connections to the defendant" and "also obscures the reality that none of [Korkmaz's] challenged conduct had anything to do with" the forum in which Ayasli resided.  Walden, 571 U.S. at 289.  The same is true here:  Ayasli would have received those messages or calls wherever he happened to be at the time they were sent.  It is only his presence in New Hampshire that creates any

---

[53] Opp. to Korkmaz Defendants' Mot. to Dismiss at 21.

relationship between Korkmaz's actions and this forum.  And that mere presence is not a contact that <u>Korkmaz</u> "creat[ed] with the forum state." <u>Id.</u> at 284.

**Proposed settlement agreement and meeting.**  Nor do Korkmaz's sending of a settlement agreement to Ayasli in New Hampshire and his single visit to the state establish purposeful availment.  While "physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact," the plaintiff "cannot be the only link between the defendant and the forum . . . ." <u>Id.</u>  In a case where a defendant "transmitt[ed] checks into the [forum] state once a year, sen[t] a few letters to [the plaintiff], and visit[ed] [the plaintiff] on one occasion in an effort to forge a settlement," the First Circuit Court of Appeals rejected a finding of purposeful availment absent evidence that the defendant "actually reached out to the plaintiff's state of residence to create a relationship" or that it "benefitted in any way from the protections of New Hampshire law." <u>Phillips Exeter, 196 F.3d at 289, 292</u>.  So, a single piece of mail and a single visit to New Hampshire, sent or made months to years after the conduct giving rise to Ayasli's claims and sent or made solely because of Ayasli's presence in the forum, are unlikely to constitute purposeful availment.

Because Ayasli has not carried his burden of demonstrating purposeful availment by the Korkmaz defendants, the court lacks personal jurisdiction over them under New Hampshire's long-arm statute.  It therefore need not reach the third element of the personal-jurisdiction analysis, the reasonability analysis.

### 2.    Fatih Akol

New Hampshire's long-arm statute likewise does not afford the court personal

jurisdiction over defendant Fatih Akol.  Ayasli argues for specific personal jurisdiction

under the New Hampshire long-arm statute over Akol, who has never visited the state,

based solely on Akol's telephonic and email communications with Ayasli in his role as

General Manager and Chairman of the Board of Directors of BoraJet and during the

negotiation of the BoraJet sale.[54]  Ayasli contends that Akol's sale-related

communications with him are related to his RICO claim "because they were instrumental

in the RICO Enterprise's extortion of Dr. Ayasli's business."[55]  And, as discussed supra

Part III.A.1.a, the "transmission of information into New Hampshire by way of telephone

or mail is unquestionably a contact for purposes of [the relatedness] analysis."  Sawtelle,

70 F3d at 1390.  Akol does not appear to dispute the relatedness element of the due

process analysis, other than to dispute, as a whole, whether Ayasli has stated a claim

against him.[56]

---

[54] See Plaintiff's Consolidated Opp. to Akol's and Mega Varlik's Mots. to Dismiss ("Consolidated Opp.") (doc. no. 60) at 5, 7 & n.5, 10; Ayasli Decl. ¶¶ 11–12 at Consolidated Opp. App. 3; Ayasli Decl. Ex. I-A at Consolidated Opp. App. 7–32.

[55] Consolidated Opp. at 7 n.5.

[56] Akol's Reply in Supp. of Mot. to Dismiss (doc. no. 67) at 2–3.  Specifically, the arguments that Akol raises against personal jurisdiction on these grounds focus only on the purposeful availment element of the analysis.  He also asserts a Rule 12(b)(6) challenge to Ayasli's claims, but that alone does not amount to an argument that his communications concerning the sale of BoraJet fail to satisfy the relatedness element of a personal jurisdiction analysis.

Ayasli has not, however, carried his burden on purposeful availment.  Invoking Akol's communications about the sale of BoraJet, Ayasli contends in a single sentence that "Akol knew that Dr. Ayasli lived in New Hampshire and purposefully directed his conduct into the United States to induce Dr. Ayasli to enter into the BoraJet Agreement and to extort him thereafter."[57]  The only evidence he offers that Akol knew Ayasli lived in New Hampshire, however, is an email between two other individuals on which Akol was copied containing a receipt for a wire transfer from one of Ayasli's bank accounts.[58]  Even assuming that sufficed to put Akol on notice of Ayasli's New Hampshire residence, as discussed supra with respect to Korkmaz's WhatsApp messages, when "[d]efendants' contacts with New Hampshire . . . [are] limited to communicating with the [plaintiffs] in their home state," those communications alone do not rise to the level of purposeful availment.  Sawtelle, 70 F.3d at 1391.  Here, Akol's communications with Ayasli concerned the business and sale negotiations relating to Ayasli's airline in Turkey, and were directed at Ayasli, wherever he may have been located.  Because Akol's contacts with New Hampshire are limited to communicating with Ayasli in his home state, Ayasli has not demonstrated purposeful availment.

Finally, Ayasli invokes a "co-conspirator theory of personal jurisdiction," under which "the acts of [a] conspirator in furtherance of a conspiracy may be attributed to the

---

[57] Consolidated Opp. at 7.

[58] See Consolidated Opp. at 7 n.5; Ayasli Decl. ¶ 14 at Consolidated Opp. App. 3; Ayasli Decl. Ex. I-G, Consolidated Opp. App. 33–34.

other members of the conspiracy."  Textor, 711 F.2d at 1392.  He argues that Akol is

subject to jurisdiction here under New Hampshire's long-arm statute because of

Korkmaz's actions and "through the actions of . . . Defendants SBK USA and Ozkaraman

who defaulted in this District."[59]  But the First Circuit Court of Appeals has not adopted

this co-conspirator theory of personal jurisdiction.  See Glaros v. Perse, 628 F.2d 679,

682 (1st Cir. 1980) ("[W]e do not mean to imply that we would adopt its rather liberal

approach to conspiracy pleading, or to decide that we would recognize a conspiracy

theory of personal jurisdiction at all.").  And "the Supreme Court has labeled the

conspiracy doctrine in the venue context as having 'all the earmarks of a frivolous albeit

ingenious attempt to expand the [venue] statute.'"  New England Coll. v. Drew Univ.,

No. CIV. 08-CV-424-JL, 2009 WL 395753, at *3 (D.N.H. Feb. 17, 2009) (quoting

Bankers Life & Cas. Co. v. Holland, 346 U.S. 379, 384 (1953)).  Other courts in this

Circuit have explicitly rejected it.  In re New Motor Vehicles Can. Exp., 307 F.Supp.2d

145, 157–58 (D. Me.2004) (recognizing that it has been "rejected by a growing number

of courts" and that "scholars have been skeptical of the doctrine's conformance to notions

of constitutional due process.").

　　　　Even had such a theory been adopted in this Circuit, to rely on it, "a plaintiff must

allege both an actionable conspiracy and a substantial act in furtherance of the conspiracy

performed in the forum state."[60]  Textor, 711 F.2d at 1392-93.  As discussed supra

---

[59] Consolidated Opp. at 10–11.

[60] Ayasli did not mention this requirement in his briefing.  Nor does he mention that the First
Circuit has not adopted the theory.  Given that he has the burden of proving jurisdiction, were

Part III.A.1.a, to the extent that Korkmaz took any action in New Hampshire, it did not give rise to Ayasli's RICO claim and is thus unlikely to constitute a <u>substantial</u> act in furtherance of the conspiracy.  And though SBK Holdings USA and Ozkaraman have defaulted, Ayasli has not alleged any act by those parties in New Hampshire except their default, let alone any action in furtherance of the conspiracy.  Nor does Ayasli provide any authority for the proposition that this court may extend its jurisdiction over one co-conspirator when another has defaulted, absent any other action by the defaulting co-conspirator in the state.  Accordingly, Ayasli has not carried his burden of demonstrating the court's personal jurisdiction over Akol under this theory, even were it available to him.

### 3.    Mega Varlik

Ayasli does not assert that Mega Varlik has, itself, taken any action in the state of New Hampshire.[61]  He argues instead that Mega Varlik is subject to personal jurisdiction in this district under New Hampshire's long-arm statute because it "engaged in numerous contacts directed at New Hampshire through the contacts of its agent, Defendant Korkmaz," and under the co-conspirator theory of personal jurisdiction.[62]

---

this a serious argument, the court would have expected him to set out the elements necessary for carrying such a burden, as well as the relevant law of this Circuit.

[61] <u>See</u> Consolidated Opp. at 5, 7, 10–11.

[62] <u>Id</u>. at 10–11.

But as explained <u>supra</u> Part III.A.1, Korkmaz's actions do not subject him to jurisdiction in New Hampshire.  His actions, accordingly, cannot serve as the basis for this court's jurisdiction over Mega Varlik.

And, as explained <u>supra</u> Part III.A.2, even if the co-conspirator theory of personal jurisdiction were recognized in this Circuit—which it has not been—Ayasli has failed to carry his burden with respect to alleging a substantial act in furtherance of the conspiracy undertaken in New Hampshire.  Accordingly, Ayasli has not demonstrated that this court may exercise personal jurisdiction over Mega Varlik under New Hampshire's long-arm statute.

## B.    RICO jurisdiction

Having failed to demonstrate that New Hampshire's long-arm statute authorizes personal jurisdiction over the Korkmaz defendants, Akol, or Mega Varlik, Ayasli next grounds jurisdiction in the civil RICO statute.  As a general proposition, "[w]hen a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction."  Republic of Panama v. BCCI Holdings (Lux.) S.A., 119 F.3d 935, 942 (11th Cir. 1997).  In such a case, "the constitutional limits of the court's personal jurisdiction are fixed . . . not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment."  Swiss III, 274 F.3d at 618 (quoting 163 Pleasant St., 960 F.2d at 1085).  And "under the Fifth Amendment, a plaintiff need only show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state."  Id.

Ayasli has brought two claims, against all defendants, invoking that statute.[63]  See 18 U.S.C. § 1964.  He argues that it provides for nationwide service of process so as to invoke the Fifth Amendment Due Process clause analysis and, further, that the Korkmaz defendants, Akol, and Mega Varlik possess the requisite contacts with the United States as a whole subjecting them to this court's jurisdiction under that analysis.  But under the interpretation of the civil RICO statute adopted by the majority of Courts of Appeals that have addressed the question, before engaging the Fifth Amendment due process analysis with respect to other defendants, the court must be satisfied that the plaintiff has demonstrated minimum contacts between at least <u>one</u> of the defendants and the forum state sufficient to satisfy the Fourteenth Amendment's due process requirements.

The civil RICO statute includes a jurisdictional provision to the effect that "[a]ny civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs."  18 U.S.C. § 1965(a).  The remainder of that section provides:

> (b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

> (c) In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, subpenas [sic] issued by such court to compel the

---

[63] Compl. ¶¶ 589–687 (Count 1), 688–702 (Count 2).

attendance of witnesses may be served in any other judicial district, except that in any civil action or proceeding no such subpoena shall be issued for service upon any individual who resides in another district at a place more than one hundred miles from the place at which such court is held without approval given by a judge of such court upon a showing of good cause.

(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

18 U.S.C. § 1965(b)–(d).  Courts of appeals are split, however, on whether § 1965 authorizes nationwide service of process and introduces a Fifth Amendment Due Process analysis as to all defendants or whether at least one defendant must have minimum contacts with the forum.  The First Circuit Court of Appeals has not had occasion to address this issue.

The minority position, taken by the Fourth and Eleventh Circuit Courts of Appeals, holds that § 1965(d) "provides for service [of process] in any judicial district in which the defendant is found."  Republic of Panama, 119 F.3d at 942.  And because the civil RICO statute is a federal statute providing for nationwide service of process, they further conclude, "in personam jurisdiction over [defendants] is established, provided that such jurisdiction comports with the Fifth Amendment" of the United States Constitution, as long as the defendants "have been served with process in a judicial district where they respectively reside, are found, or transact their affairs."  ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 627 (4th Cir. 1997).  Were the court to adopt this interpretation, as Ayasli urges, it could exercise personal jurisdiction over Korkmaz because he was served in New York, where he undisputedly can be found and transacts his affairs, and the Fifth Amendment's due process requirements would be satisfied because Korkmaz, as a result,

"has adequate contacts with the United States as a whole . . . ."  Swiss III, 274 F.3d at 618.

The majority rejects this reading of § 1965.  The Second, Third, Seventh, Ninth, Tenth, and District of Columbia Circuit Courts of Appeals hold, instead, that the interplay of § 1965(a) and (b) governs the exercise of personal jurisdiction.  Laurel Gardens, LLC v. Mckenna, 948 F.3d 105, 114 (3d Cir. 2020); FC Inv. Grp. v. IFX Markets, Ltd., 529 F.3d 1087, 1098–1100 (D.C. Cir. 2008); Cory v. Aztec Steel Bldg., Inc., 468 F.3d 1226, 1229–33 (10th Cir. 2006); PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 70–72 (2d Cir. 1998); Lisak v. Mercantile Bancorp Inc., 834 F.2d 668, 671–72 (7th Cir. 1987); Butcher's Union Local No. 498 v. SDC Inv., Inc., 788 F.2d 535, 538–39 (9th Cir. 1986).  Under that reading, § 1965(a) mandates that "a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant."  PT United, 138 F.3d at 71.  Only after establishing personal jurisdiction over one defendant may the court then exercise personal jurisdiction over any out-of-state co-conspirators under § 1965(b).  Id. at 71–72.  And it may only do that if the out-of-state co-conspirators possess minimum contacts with the United States that satisfy the due process requirements of the Fifth Amendment.  See Cory, 468 F.3d at 1229 ("Where Congress has statutorily authorized nationwide service of process, such service establishes personal jurisdiction, provided that the federal court's exercise of jurisdiction comports with Fifth Amendment due process.").

"[T]he language and structure of the RICO provision itself" support the majority's position, whereas the minority position is based on a "relative absence of reasoning . . . ." Laurel Gardens, 948 F.3d at 117.  As the Second Circuit Court of Appeals has explained:

> Section 1965 makes sense only if all of its subsections are read together. . . . First, § 1965(a) grants personal jurisdiction over an initial defendant in a civil RICO case to the district court for the district in which that person resides, has an agent, or transacts his or her affairs.  In other words, a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant.  Second, § 1965(b) provides for nationwide service and jurisdiction over "other parties" not residing in the district, who may be additional defendants of any kind, including co-defendants, third-party defendants, or additional counter-claim defendants.  This jurisdiction is not automatic but requires a showing that the "ends of justice" so require.

PT United, 138 F.3d at 71–72.  "Going further, subsection (c) 'simply refers to service of subpoenas on witnesses'—specifically in civil or criminal actions or proceedings instituted by the government," and "subsection (d)'s reference to 'all other process' must mean process different than a summons or a government subpoena, both of which are dealt with in previous subsections."  Laurel Gardens, 948 F.3d at 118 (quoting PT United, 138 F.3d at 71; Cory, 468 F.3d at 1230).

Neither the Fourth nor Eleventh Circuit Courts of Appeals has offered an explanation, in light of the rest of the statute, for concluding that subsection (d) authorizes nationwide service of process.  The Eleventh Circuit Court of Appeals did "not pause long over" the question of whether section 1965 "potentially confers jurisdiction over the defendant," concluding without citation or analysis that "[s]ection 1965(d) of the RICO statute provides for service in any judicial district in which the defendant is found."  Republic of Panama, 119 F.3d at 942.  The Fourth Circuit Court of Appeals

likewise summarily concluded that because § 1965(d) "authorizes service of process 'in any judicial district in which such person resides, is found, has an agent, or transacts his affairs,'" it "evidenc[es] Congress' desire that '[p]rovision [be] made for nationwide venue and service of process.'"  ESAB Grp., 126 F.3d at 626 (quoting H. Rep. No. 91–1549, at 4 (1970)).

One court in this Circuit has adopted the majority's interpretation.  See Ginsburg v. Dinicola, No.  06-11509, 2007 WL 1673533, at *4 (D. Mass. Jun. 7, 2007) (Zobel, J.). One took the minority's approach, albeit before most of those in the majority had spoken. See Bridge v. Invest Am., Inc., 748 F. Supp. 948, 950 (D.R.I. 1990) (Lagueux, J.).  And a third, acknowledging the split, declined to resolve it because the plaintiff had failed to state a civil RICO claim.  See World Depot Corp. v. Onofri, No. 16-12439, 2017 WL 6003052, at *5 (D. Mass. Dec. 4, 2017) (Saylor, J.).

The court is disinclined to follow the minority view because, as explained above, the majority's is more consistent with a reading of § 1965 as a whole.  And under the majority approach, § 1965 does not grant this court personal jurisdiction over the Korkmaz defendants, Akol, or Mega Varlik.  As explained supra Part III.A, Ayasli has not established the requisite minimum contacts with New Hampshire as to Korkmaz or Akol and concedes that the other Korkmaz defendants and Mega Varlik lack any of their own contacts with New Hampshire.  He does not identify any other defendants whose contacts with New Hampshire satisfy the minimum contacts test.  Neither the complaint nor any of Ayasli's briefing suggests that SBK Holdings USA or Ozkaraman have any contact with New Hampshire whatsoever, beyond the fact that they have defaulted in this

action.  Accordingly, the civil RICO statute does not grant this court personal jurisdiction over the Korkmaz defendants, Akol, or Mega Varlik.

Ayasli argues that Akol and Mega Varlik have waived any argument that the court lacks personal jurisdiction over them under the RICO statute by failing to challenge this jurisdictional basis in their opening memoranda.[64]  Though true that arguments raised for the first time in a reply are generally waived, see B. Fernandez & HNOS, Inc. v. Kellogg USA, Inc., 516 F.3d 18, 28 (1st Cir. 2008), that is not the case here.  Akol and Mega Varlik both explicitly joined in the Korkmaz defendants' briefing on personal jurisdiction, which includes their arguments under the RICO statute and Rule 4(k)(2).[65]

Even if they had not done so, to find jurisdiction on a waiver basis would lead to an absurd result.  Ayasli has not established the necessary minimum contacts with New Hampshire by any defendant.  All moving defendants dispute the presence of such minimum contacts.  And the RICO statute predicates jurisdiction on a finding that at least one defendant has those minimum contacts.  For the court to exercise jurisdiction under

---

[64] Consolidated Opp. at 4.  Otherwise, Ayasli merely reiterates the same arguments in favor of RICO-based jurisdiction over Akol and Mega Varlik as he did over the Korkmaz defendants. E.g. id. at 5–6.  Because the court adopts the majority approach here, and because Ayasli has not demonstrated the necessary minimum contacts with New Hampshire with respect to any defendant, this court lacks jurisdiction over the defendants under the RICO statute.

[65] See Akol's Mot. to Dismiss (doc. no. 40) ¶ 1 ("Mr. Akol joins the Korkmaz Defendants in stating that this action must be dismissed pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.); Akol's Mem. in Supp. of Mot. to Dismiss (doc. no. 40-1) at 5 (joining "in full his co-defendants' persuasive briefing . . . with respect to New Hampshire's lack of personal jurisdiction over him, or any of the defendants."); Mega Varlik's Mem. in Supp. of Mot. to Dismiss (doc. no. 47-1) at 5 ("Mega Varlik again joins the briefing and oral argument of its co-defendants as it relates to the lack of personal jurisdiction over any of the defendants in this matter . . . .").

the RICO statute when no minimum contacts in New Hampshire have been established as to <u>any</u> defendant, solely on the basis of waiver, would render the minimum-contacts requirement a nullity.  It declines to do so here.

Because the court follows the majority approach, it need not—and therefore does not—address in this context Ayasli's arguments that assertion of personal jurisdiction under the RICO statute comports with the due process requirements of the Fifth Amendment, either through "tag" jurisdiction or through the moving defendants' contacts with the United States as a whole.[66]

### C.      Rule 4(k)(2)

Ayasli argues, finally, that this court may exercise personal jurisdiction over the Korkmaz defendants, Akol, and Mega Varlik under Federal Rule of Civil Procedure 4(k)(2), "which functions as a sort of federal long-arm statute."[67]  Swiss I, 191 F.3d at 36.  Under that rule:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2).

---

[66] <u>See</u> Opp. to Korkmaz Defendants' Mot. to Dismiss at 26–27; Consolidated Opp. at 6–10.

[67] Opp. to Korkmaz Defendants' Mot. to Dismiss at 27–28; Consolidated Opp. at 11.

"[A] plaintiff who seeks to invoke Rule 4(k)(2) must make a prima facie case for the applicability of the rule," which includes "a tripartite showing (1) that the claim asserted arises under federal law, (2) that personal jurisdiction is not available under any situation-specific federal statute, and (3) that the putative defendant's contacts with the nation as a whole suffice to satisfy the applicable constitutional requirements." Swiss I, 191 F.3d at 41.  In addition to these requirements, the First Circuit Court of Appeals also requires that the plaintiff "certify that, based on the information that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state." Id. (emphasis added).  If the plaintiff makes this showing, the burden then "shifts to the defendant to produce evidence which, if credited, would show either that one or more specific states exist in which it would be subject to suit or that its contacts with the United States are constitutionally insufficient." Id.

Ayasli has not made the requisite showing.  He fails to certify that Korkmaz, the other Korkmaz defendants, Akol, or Mega Varlik are "not subject to suit in the courts of general jurisdiction of any state."  Nor could he.  Ayasli has affirmatively sought transfer of this action to the United States District Court for the Southern District of New York, which Ayasli argues may exercise personal jurisdiction over Korkmaz and Mega Varlik because that is where those defendants were served.[68]  See First Am. Corp. v. Price

---

[68] Opp. to Korkmaz Defendants' Mot. at 28 n.4; Consolidated Opp. at 11.  There is some dispute about whether Mega Varlik was served in New York or abroad.  Regardless, as discussed infra, Korkmaz also claims that Mega Varlik is subject to personal jurisdiction in California, and accordingly has not made the requisite certification.  And, as explained infra, Mega Varlik lacks the requisite contacts with the United States for the court to exercise jurisdiction consistent with the due process requirements of the Fifth Amendment.

Waterhouse LLP, 154 F.3d 16, 21 (2d Cir. 1998) (service in New York subjects

defendant to personal jurisdiction in New York).  Ayasli likewise argues that districts

other than this one may exercise jurisdiction over Akol and Mega Varlik.  Specifically,

Ayasli seeks transfer to the District Court for the Central District of California, arguing

that California has personal jurisdiction over Akol because he was a California resident[69]

and over Mega Varlik through contacts by its agent, Jacob Kingston.[70]

Though the court rejects Ayasli's arguments that jurisdiction over Mega Varlik

exists in California, see infra Part V.B.1, Rule 4(k)(2) does not authorize jurisdiction over

that defendant because, as further explained in that Part, such jurisdiction would not

comport with Fifth Amendment due process considerations.  Because Ayasli has not

made the requisite showing, the court may not exercise personal jurisdiction over the

moving defendants under Rule 4(k)(2).

## IV.   **Motions to dismiss on other grounds**

All of the moving defendants seek to dismiss this action, as well, on grounds of

forum non conveniens, arguing that Turkey is the more appropriate forum for resolution

---

[69] Mere hours after the court issued its margin order resolving these various motions, but before
this written order issued, Akol's counsel submitted a letter explaining that he had moved from
California to Florida three weeks prior.  See Akol Letter (doc. no. 72).  Though he informed
opposing counsel, Akol failed to apprise the court of this development and has offered no
argument regarding its effect on the jurisdictional analysis.  Ultimately, as explained herein, it
does not alter the outcome; but where the court had informed his counsel on June 16 that a
written order would be forthcoming, it behooved him to raise the issue as soon as it occurred.

[70] Consolidated Opp. at 11.

of Ayasli's claims.[71]  Akol also seeks dismissal under Rule 12(b)(6), arguing that Ayasli

has failed to state a claim against him.[72]

"[A] federal court has leeway to choose among threshold grounds for denying

audience to a case on the merits." Sinochem, 549 U.S. at 431.  "A district court therefore

may dispose of an action by a forum non conveniens dismissal, bypassing questions of

subject-matter and personal jurisdiction, when considerations of convenience, fairness,

and judicial economy so warrant." Id. at 432.  Though a court may choose the threshold,

non-merits basis for dismissal, "[i]f . . . a court can readily determine that it lacks

jurisdiction over the cause or the defendant, the proper course would be to dismiss on that

ground." Id. at 436.  It is when "subject-matter or personal jurisdiction is difficult to

determine, and forum non conveniens considerations weigh heavily in favor of dismissal,

[that] the court properly takes the less burdensome course" of addressing forum non

conveniens instead. Id.  Where, as here, the court clearly lacks personal jurisdiction over

the defendants, and where it believes additional evidence may be necessary to resolve the

forum non conveniens argument, that would not be "the less burdensome course."

Nor can it reach the merits of Akol's Rule 12(b)(6) argument.  Having determined

that it lacks personal jurisdiction over Akol, the court "may not assume jurisdiction for

the purpose of deciding the merits of the case." Id. at 431.

---

[71] See Korkmaz Defendants' Mem. in Supp. of Mot. to Dismiss at 19–27; Akol's Mem. in Supp.
of Mot. to Dismiss at 6; Mega Varlik's Mem. in Supp. of Mot. to Dismiss at 4.

[72] Akol's Mem. in Supp. of Mot. to Dismiss at 6–14.

The court understands that the defendants would prefer to have a definitive ruling on the forum and merits issues here – and understandably so, when Turkey may well be the ultimate destination of this lawsuit.  As the court expressed to counsel during its April 9, 2020 video conference, however, such a determination would likely involve further taking of evidence, including potentially from a court-appointed expert under Fed. R. Evid. 706.  And because the court lacks personal jurisdiction over any of these defendants, it is disinclined to initiate such further proceedings and, accordingly, does not reach the forum non conveniens or merits-based arguments.

## V.   <u>Venue transfer analysis</u>

During the pandemic-necessitated video conference on April 9, 2020, the court indicated some skepticism about its personal jurisdiction over the defendants.  After that conference, Ayasli moved for transfer of venue to the United States District Court for the Central District of California.[73]  Ayasli had previously sought transfer to the United States District Court for the Southern District of New York as an alternative to dismissal, though he did so as an undeveloped, single-sentence request in a footnote in his opposition to the Korkmaz defendants' motion to dismiss.[74]  As Ayasli himself has observed, arguments raised for the first time in replies and footnotes are generally waived.[75]  E.g., Rife v. One W. Bank, F.S.B., 873 F.3d 17, 19 (1st Cir. 2017) (arguments

---

[73] <u>See</u> Mot. to Transfer (doc. no. 50).

[74] Opp. to Korkmaz Defendants' Mot. to Dismiss at 28 n.4.

[75] <u>E.g.</u>, Consolidated Opp. at 4 & n.3.

raised on reply are deemed waived); Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38,

60 n.17 (1st Cir. 1999) (arguments raised only in footnotes or cursory manner are

waived).  But where, as here, Ayasli subsequently filed a separate motion seeking this

relief and where the court has the power to sua sponte transfer a case over which it lacks

jurisdiction if justice requires it, the court declines to deem the argument waived.

Most of the moving defendants argue that Ayasli has failed to carry his burden of

showing that this action "could have been brought" in the Central District of California

because the United States District Court for that district could not exercise personal

jurisdiction over the defendants and because the BoraJet Agreement's forum selection

clause mandates that the case proceed in Turkey.[76]  All of the moving defendants also

raise venue objections, arguing that California is as inconvenient a forum as New

Hampshire because Turkey is the more appropriate forum.[77]  Finally, the defendants

contends that transfer is not in the interest of justice because the transferred action would

be subject to dismissal on one or more of forum non conveniens, forum-selection clause,

or Rule 12(b)(6) grounds.

Ayasli could have brought this action in the United States District for the Central

District of California, as 28 U.S.C. § 1631 requires, because personal jurisdiction lies in

that court over almost all of the defendants.  That court may exercise general jurisdiction

---

[76] Korkmaz Defendants' Opp. to Transfer Mot. (doc. no. 57-1) at 8–14; Mega Varlik's Opp. to Transfer Mot. (doc. no. 58-1) at 4–8.

[77] Akol's Opp. to Transfer Mot. (doc. no. 54) at 3–4; Korkmaz Defendants' Opp. to Transfer Mot. at 3–6, 14; Mega Varlik's Opp. to Transfer Mot. at 4–8

over at least defendant SBK Holdings USA, and may exercise jurisdiction over the Korkmaz defendants under the civil RICO statute's nationwide service of process provision.  In light of the case's complexities and the amount of time and effort that it took Ayasli to serve the defendants, it is also in the interest of justice to transfer this action, as against Akol and the Korkmaz defendants, to that court.  Because that court may not exercise personal jurisdiction over Mega Varlik, however, this court dismisses Ayasli's claims against that defendant.

### A.      Applicable legal standard

When the court in which a civil action is filed "finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed . . . ."  28 U.S.C. § 1631.  Section 1631 thus creates "a presumption—albeit a rebuttable one—in favor of transfer" through the apparently contradictory use of the word "shall" and the invocation of "the interest of justice." Britell v. United States, 318 F.3d 70, 73 (1st Cir. 2003).  But the "conclusion that § 1631 permits transfer where personal jurisdiction is lacking does not mean the [plaintiff] automatically gets [his] requested transfer," because the court must still "determine[ ] whether transfer is 'in the interest of justice' . . . ."  Fed. Home Loan Bank of Bos. v. Moody's Corp., 821 F.3d 102, 119 (1st Cir. 2016), abrogated on other grounds by Lightfoot v. Cendant Mortg. Corp., 137 S. Ct. 553 (2017).

Thus, before a court may transfer an action under this provision, it must make two

determinations.  First, it must be assured that the destination court is one "in which the

action . . . could have been brought at the time it was filed or noticed."  Id.  This requires

that the transferee court have jurisdiction over the matter and the parties and that venue

lies in that court.  See Rodriguez-Roman v. I.N.S., 98 F.3d 416, 424 (9th Cir. 1996)

(requiring both jurisdiction and proper venue).  Second, it must determine that the

transfer is "in the interest of justice."  Id.  "The burden of proof" as to these requirements

"rests with the party seeking transfer."  Coady v. Ashcraft & Gerel, 223 F.3d 1, 11 (1st

Cir. 2000).

###    B.    Jurisdiction and venue in California

Ayasli argues that he could have brought this case in the United States District

Court for the Central District of California because that court has personal jurisdiction

over the defendants under both California's long-arm statute and the civil RICO statute,

and because venue would be proper in that court.  The moving defendants counter,

arguing that that court lacks personal jurisdiction over them and that venue is improper in

light of the forum selection clause in the BoraJet Agreement and their forum non

conveniens arguments.

As explained more fully below, at least a partial transfer is warranted because the

United States District Court for the Central District of California may exercise general

personal jurisdiction over several of the defendants and venue is uncontested.

Specifically, that court may exercise general personal jurisdiction over at least defendant

SBK Holdings USA.  And because jurisdiction is established over at least one defendant

in that court, it may likewise exercise personal jurisdiction over the Korkmaz defendants

under the civil RICO statute.  And though this court is sympathetic to the defendants'

venue-related arguments, none of them argues that venue is improper in California so as

to preclude transfer.

### 1.      Personal jurisdiction in California

As explained supra Part III.B, "a civil RICO action can only be brought in a

district court where personal jurisdiction based on minimum contacts is established as to

at least one defendant."  PT United, 138 F.3d at 71.  Where those minimum contacts as to

one defendant have been established, § 1965(b) authorizes nationwide service of process

when "the ends of justice require" it.  And "[w]here Congress has statutorily authorized

nationwide service of process, such service establishes personal jurisdiction, provided

that the federal court's exercise of jurisdiction comports with Fifth Amendment due

process."  Cory, 468 F.3d at 1229.  See also Laurel Gardens, 948 F.3d at 122 (quoting

Cory and finding minimum contacts with the United States as a whole when defendants

resided in Delaware); Doe v. Unocal Corp., 27 F. Supp. 2d 1174, 1182 (C.D. Cal. 1998)

("Where a defendant is properly served in the United States under RICO's nationwide

service provision, that defendant's national contacts, rather than its minimum contacts

with the forum state, determine whether the district court has personal jurisdiction over

the defendant."), aff'd and adopted, 248 F.3d 915 (9th Cir. 2001).

To establish that the United States District Court for the Central District of California may exercise personal jurisdiction over the defendants under the civil RICO statute, then, Ayasli—as the party seeking transfer—must establish that personal jurisdiction exists over at least one defendant that comports with the due process requirements of the Fourteenth Amendment and that exercise of jurisdiction over the other defendants comports with the due process requirements of the Fifth Amendment.[78] Here, he has established that court's personal jurisdiction over at least one defendant— SBK Holdings USA—and that exercise of jurisdiction over the Korkmaz defendants in California satisfies the Fifth Amendment's due process requirements in light of Korkmaz's contacts with the United States as a whole.

Ayasli has not, however, demonstrated contacts between Mega Varlik and the nation as a whole such that exercising jurisdiction over Mega Varlik satisfies the due process requirements of the Fifth Amendment.  And because Mega Varlik lacks minimum contacts with the United States as a whole, it follows that Ayasli has failed to demonstrate minimum contacts with California, specifically, so as to create personal jurisdiction over Mega Varlik under that state's long-arm statute

### a)      Long-arm jurisdiction over one defendant

California permits "[a] court of [that] state [to] exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."  Cal. Civ.

---

[78] No party here disputes whether the "ends of justice" are satisfied by nationwide service of process, as 18 U.S.C. § 1965(b) requires.  The defendants instead dispute whether transfer serves the interest of justice, as 28 U.S.C. § 1631 requires, which is a separate analysis.

Proc. Code § 410.10.  "The Due Process Clause of the Fourteenth Amendment sets the outer boundaries of a state tribunal's authority to proceed against a defendant." Goodyear, 564 U.S. at 923.  "Constitutional due process requires that a defendant 'have certain minimum contacts' with the forum state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp., 905 F.3d 597, 602 (9th Cir. 2018) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

Personal jurisdiction may be general or specific.  "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home."  Goodyear, 564 U.S. at 924.  "With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'"  Daimler AG v. Bauman, 571 U.S. 117, 137 (2014).

There does not appear to be any dispute that California may exercise general jurisdiction over SBK Holdings USA on this basis at the time Ayasli filed this action.  No party disputes that SBK Holdings USA is domiciled in California.[79]  And that appears to be the case:  SBK Holdings USA is a California company with its principal place of business in Commerce, California.[80]

---

[79] Defendant SBK Holdings USA has defaulted in this action.  None of the defendants dispute its residency in California.

[80] Akol's Mem. in Supp. of Mot. to Dismiss at 2 n.1.

California may also exercise personal jurisdiction over defendant Akol.  Though he moved to California only after this lawsuit was initiated, neither he nor any other defendant argues that as an impediment to a district court in California exercising general jurisdiction over him in connection with this action.[81]  In fact, he nowhere argues that personal jurisdiction over him in California would be improper on any grounds.[82]  And despite having recently relocated to Florida, he still does not argue that California lacks personal jurisdiction over time.  Personal jurisdiction arguments may be waived, see Rife, 873 F.3d at 19, and Akol has done so by not raising that argument here.  Even had he raised it, that court's jurisdiction over SBK Holdings USA alone suffices to ground its jurisdiction under the civil RICO statute over other defendants possessing minimum contacts with the United States as a whole.  And Akol, who has resided in the United States for some time now, has not disputed those contacts.

Ayasli has therefore demonstrated that the court in California may exercise personal jurisdiction over at least one of the defendants.

### b)      Fifth Amendment minimum contacts by the other defendants

Having established minimum-contacts-based personal jurisdiction over at least one defendant in California, Ayasli next must demonstrate that the Central District of California exercising jurisdiction over the other defendants under the national-service

---

[81] See generally Akol's Opp. to Transfer Mot.; Akol's Reply in Supp. of Mot. to Dismiss.

[82] See Akol's Opp. to Transfer Mot.at 1–4; Akol's Reply in Supp. of Mot. to Dismiss at 3–4.

provision of the civil RICO act comports with the due process requirements of the Fifth Amendment.  This is because, as explained supra Part III.B, the national-service provision of the civil RICO act only permits a court to exercise jurisdiction over the other defendants if that jurisdiction satisfies the Fifth Amendment's due process requirements. "[U]nder the Fifth Amendment, a plaintiff need only show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state." Swiss III, 274 F.3d at 618.

The Korkmaz defendants observe, correctly, that Ayasli fails to outline the defendants' contacts with the United States in his motion to transfer.[83]  In fact, Ayasli rejects this burden entirely, asserting that the national-service provision of the civil RICO statute "permits [the Central District of California] to exercise jurisdiction over the Korkmaz defendants who were physically served in another U.S. district (New York). That ends the inquiry."[84]  It may be that Ayasli's position should end the court's inquiry as well.  But in the interest of completeness, and of assuring itself of a correct result, the court considers whether Ayasli has established the other defendants' necessary contacts with the United States.  His transfer motion at the least refers to such arguments made, albeit cursorily, in other memoranda presently before the court.[85]

---

[83] Korkmaz Defendants' Opp. to Transfer Mot. at 10–12.

[84] Reply in Supp. of Transfer Mot. (doc. no. 64) at 5.

[85] Id. ("In any event, Dr. Ayasli previously and extensively briefed their contacts with the United States.").  See also Opp. to Korkmaz Mot. to Dismiss at 23, 27; Consolidated Opp. 9–10.

The minimum contacts test under the Fifth Amendment is substantially the same as that under the Fourteenth, the only difference being that the defendant's contacts must be with the United States as a whole, rather than with any individual state.  The Ninth Circuit Court of Appeals uses the familiar three-element test for specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004).  "The plaintiff bears the burden of satisfying the first two prongs of the test," and if he does so, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable."  Id.

**Korkmaz defendants**.  Ayasli offers two arguments intended to circumvent the traditional minimum contacts inquiry.  Because neither succeeds, the court engaged in that inquiry, concluding that Korkmaz does have the requisite minimum contacts with the United States as a whole to satisfy the Fifth Amendment's due process requirements.

Ayasli argues, first, that service of process on Korkmaz in New York satisfies the Fifth Amendment due process analysis because "personal service upon a physically present defendant suffice[s] to confer jurisdiction . . . ."  Burnham v. Superior Court of California, Cty. of Marin, 495 U.S. 604, 612 (1990).  But the civil RICO statute itself

authorizes that service.  And for such a national-service provision to authorize

jurisdiction requires, on top of the service itself, that the defendant have "minimum

contacts" with the United States so as to satisfy the Fifth Amendment's due process

requirements.  See Cory, 468 F.3d at 1229.  If mere service alone satisfied the "minimum

contacts" requirement, that would render the due-process analysis a nullity:  the national-

service provision would ipso facto create jurisdiction.  And that is clearly not the case.

     Relying on authority from the United States District Court for the Southern

District of New York, see In re Ski Train Fire in Kaprun, Aus., 257 F. Supp. 2d 717, 734

(S.D.N.Y. 2003), Ayasli then argues that the court "need not decide personal jurisdiction

of the transferee court over the Korkmaz Defendants because jurisdiction lies against

other co-defendants."[86]  But that case, which did not rely on the civil RICO statute for

jurisdiction, only supports a finding of jurisdiction in the circumstances Ayasli describes

when the defendants are all part of the same corporate instrumentality.  See In re Ski

Train Fire, 257 F. Supp. 2d at 732–33.  That is not the case here.

     So the court turns to the traditional minimum contacts inquiry to determine

whether Ayasli has carried his burden of demonstrating personal jurisdiction in California

over the Korkmaz defendants.  Ayasli has easily satisfied the purposeful direction

element with respect to Korkmaz, and thus the Korkmaz defendants.[87]  Specifically,

---

[86] Ayasli's Mem. in Response to June 16, 2020 Order ("Ayasli's Supplemental Mem.") (doc. no. 70) at 3–4.

[87] Korkmaz waited to argue that his conduct may not be imputed to SBK Holdings and Bugaraj until his sixth memorandum on dismissal and transfer issues—a memorandum invited by the court to address a very limited question of one potential jurisdictional contact.  See Korkmaz Defendants' Mem. in Response to June 16, 2020 Order ("Korkmaz Defendants' Supplemental

Ayasli has submitted evidence, which Korkmaz does not dispute, that Korkmaz conducts business and promotes cultural education in California, specifically. Korkmaz received awards from California's legislature honoring his work and community involvement in 2014.[88] Korkmaz has also given speeches and attended conferences in Washington D.C. and New York.[89] Korkmaz does not dispute that this element is satisfied.[90]

Whether exercising jurisdiction over the Korkmaz defendants comports with the due process requirements of the Fifth Amendment turns, then, on whether Ayasli's claims "arise[ ] out of or relate[ ] to" Korkmaz's activities in the United States. "Under the 'but for' test" invoked by the Ninth Circuit Court of Appeals for determining relatedness, "a lawsuit arises out of a defendant's contacts with the forum state if a direct nexus exists between those contacts and the cause of action." In re W. States Wholesale Nat. Gas Antitrust Litig., 715 F.3d 716, 742 (9th Cir. 2013) (internal quotations and citations omitted).

---

Mem.") (doc. no. 69) at 4. Because he did not dispute this point in any of his prior briefing and because he asserts it through a single, unsupported sentence in this memorandum, he has waived that argument. See Nat'l Foreign Trade Council, 181 F.3d at 60 n. 17. His conduct may be imputed to SBK Holdings and Bugaraj because, "[f]or purposes of personal jurisdiction, the actions of an agent are attributable to the principal." Sher v. Johnson, 911 F.2d 1357, 1362 (9th Cir. 1990).

[88] Miller Decl. ¶ 22 at Opp. to Korkmaz App. 102; Miller Decl. Ex. II-T at Opp. to Korkmaz App. 450–52.

[89] Ayasli Decl. ¶¶ 25–27 at Opp. to Korkmaz App. 6–7.

[90] See Korkmaz Defendants' Opp. to Transfer Mot. at 11–14.

Ayasli cites a small set of case-related contacts between Korkmaz and the United States,[91] only one of which appears to satisfy the relatedness element:  A visit that Korkmaz made to Utah in February 2018.[92]  Ayasli alleges that Korkmaz "travelled from Turkey to Salt Lake City, Utah to confront, threaten, and attempt to bribe University of Utah Professor Hakan Yavuz into pressuring Dr. Ayasli to 'surrender' and pay a monetary 'settlement' to the RICO Enterprise."[93]  Professor Yavuz explains that he "clearly understood that [the] purpose of [the] visit from Mr. Korkmaz was to intimidate [him] to prevent [him] from helping Dr. Ayasli clear his name in Turkey from the FETO allegations that were made against him."[94]

As Korkmaz observed, of course, this visit occurred significantly after the event that sparked this lawsuit:  BoraJet's sale to Bugaraj.[95]  And the visit itself does not constitute a necessary element of Ayasli's RICO and conspiracy claims, in the sense that, as pleaded, those claims would exist even if Korkmaz had never visited Professor Yavuz.

---

[91] See Reply in Supp. of Transfer Mot. at 5 (citing Opp. to Korkmaz Defendants' Mot. to Dismiss at 15–22, 26–27); Consolidated Opp. at 9 (citing Opp. to Korkmaz Defendants' Mot. to Dismiss at 15–22, 27).  Ayasli also asserts Korkmaz's hiring of a New York law firm as satisfying the relatedness element (see Opp. to Korkmaz Defendants' Mot. to Dismiss at 27), but in his reply in support of his motion to transfer, concedes that "New York is only connected to this case because the Korkmaz Defendants . . . were served there . . . ."  Reply in Supp. of Transfer Mot. at 2.

[92] Opp. to Korkmaz Mot. to Dismiss at 27.  Following oral argument on Ayasli's transfer motion, the court allowed Ayasli and the Korkmaz defendants to submit limited briefing on whether this contact with the United States satisfies the relatedness element.

[93] Compl. ¶ 555.

[94] Yavuz Decl. ¶ 18 at Consolidated Obj. App. 128.

[95] Korkmaz Defendants' Supplemental Mem. at 7–8.

But Ayasli alleges that the RICO enterprise conspired not only to effectuate that sale and the subsequent recall of Ayasli's remaining debts, but also to extort Ayasli through a series of lawsuits in Turkey and continued pressure on Ayasli to settle those lawsuits.[96] To succeed on his civil RICO claim, Ayasli must demonstrate a "pattern of racketeering activity" by demonstrating a number of predicate acts of racketeering and/or extortion. See 18 U.S.C. §§ 1961(5), 1962(c).  Insofar as a jury could conclude that Korkmaz's visit to Professor Yavuz constituted one of those predicate acts—specifically, an act designed to extort Ayasli into settling the Turkish litigations—the visit could form a basis for liability on Ayasli's RICO claim.  Because of this, Ayasli has carried his burden of making at least a preliminary showing that his civil RICO claim arises out of Korkmaz's visit to Professor Yavuz.[97]

None of Ayasli's other proposed contacts appear to satisfy this requirement.  First, he contends that the alleged conspiracy "was "conceived, plotted, and executed in California by co-conspirators Lev Dermen with Defendant Korkmaz and the other defendants."[98]  For this proposition, Ayasli cites paragraphs 324 to 335 of his complaint.

---

[96] E.g., Compl. ¶¶ 596(a)(5)–(8).

[97] The court notes that Korkmaz's arguments to the contrary are neither baseless nor weak.  On balance, however, transfer of this litigation to the Central District of California conforms to applicable law and for reasons based in both litigation efficiency and judicial economy, the court favors a transfer that consolidates as much of the litigation as possible, as opposed to splitting it between California (where Akol has conceded personal jurisdiction) and New York (where the Korkmaz defendants concede personal jurisdiction).

[98] Mot. to Transfer Mem. at 9.  While Ayasli now that he "intends to litigate claims against . . . Dermen, significantly clarified by [his] just-concluded criminal trial, in California,"

But the only US-based conduct alleged in those paragraphs involves Lev Dermen, an alleged but non-defendant co-conspirator, "bragging in California about his group's plans to 'take over an airline in Turkey,'" later identifying that airline as BoraJet, and stating that "he and his business associates" had money and "a plan ready to implement" when the right opportunity came along.[99]   The remainder of the allegations – and all of those specific to Korkmaz – concern the alleged defamatory media campaign in Turkey.[100] These allegations therefore fail to satisfy the relatedness element with respect to Korkmaz himself.

Nor do the mere existence of a joint bank account held by Korkmaz and Dermen in California, or the mere existence of SBK Holdings USA as a California company, establish relatedness.[101]   Ayasli has offered a flow chart from Dermen's prosecution on money laundering charges in Utah ostensibly demonstrating funds flowing from Turkey into that account.[102]   But he offers no authority suggesting that the presence of a bank account in the forum alone, absent some action by Korkmaz in the forum or some specific action taken through the account, creates personal jurisdiction over Korkmaz. Though Ayasli's counsel suggested the existence of such authority at oral argument, in

---

Consolidated Opp. at 2, he has not sought to add Dermen as a co-defendant to this action, so his stated intention to litigate against Dermen has no bearing on resolution of the pending motions.

[99] Compl. ¶¶ 324–26.

[100] Id. ¶¶ 327–335.

[101] See Mot. to Transfer Mem. at 9–10.

[102] See id. at 9; Miller Decl. Ex. 1 (doc. no. 50-2).

the form of numerous cases from the Southern District of New York, he has not cited any of those cases in any memorandum in this action.  Similarly, he offers no explanation of how SBK Holdings USA's existence as a California company creates jurisdiction over Korkmaz.

Because Ayasli has carried his burden of demonstrating purposeful availment and relatedness, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." Schwarzenegger, 374 F.3d at 802. The Korkmaz defendants have not made any argument against reasonableness separate from and beyond their arguments, addressed infra Part V.C, that transfer would not be in the interest of justice.  And because the court rejects those arguments for the reasons explained infra, Part V.C, the Korkmaz defendants have not demonstrated that exercise of personal jurisdiction over them in California would be unreasonable.

Ayasli has thus demonstrated that Korkmaz and his companies may be subject to personal jurisdiction in California under the RICO statute because he has demonstrated Korkmaz's minimum contacts with the United States as a whole, including Korkmaz's alleged attempt in Utah to indirectly threaten Ayasli through his meeting with Professor Yavuz.  The court therefore need not reach the question of whether California's long-arm statute may also grant that court personal jurisdiction over Korkmaz, though a review of the California-based contacts discussed above suggests that it would not.

**Mega Varlik**.  Ayasli does not contend that Mega Varlik addressed any activity toward or into the United States, or that it has, itself, the minimum contacts necessary to establish personal jurisdiction over it under either the civil RICO statute or Fed. R. Civ.

P. 4(k)(2), which likewise requires that the "defendant's contacts with the nation as a whole suffice to satisfy the applicable constitutional requirement."  Swiss I, 191 F.3d at 41.  Instead, he offers four theories of contact between Mega Varlik, a Turkish company, and the United States as a whole which, he contends, suffice to establish minimum contacts for civil RICO and Rule 4(k)(2) purposes.  None of them do.

First, he contends that "Mega Varlik was validly served in New York on April 12, 2019," through service on Korkmaz.[103]  Mega Varlik disputes whether it was validly served in New York, in light of the fact that Ayasli subsequently sought and obtained this court's leave to serve Mega Varlik by email in Turkey.[104]  Even if Mega Varlik was served in New York, however, as explained supra with respect to Korkmaz, service alone does not satisfy the requirement of minimum contacts with the United States to establish jurisdiction under the civil RICO statute.  And if, as is more likely here, service was effected on Mega Varlik in Turkey (rather than New York), the civil RICO statute's nationwide service provision cannot support jurisdiction over Mega Varlik because it "authorizes nationwide service of process, but not international service."  Stauffacher v. Bennett, 969 F.2d 455, 460–61 (7th Cir. 1992).

Second, Ayasli contends that "Korkmaz's contacts may be attributed to Mega Varlik because Korkmaz 'has control and influence over Defendant business[ ] Mega

---

[103] Consolidated Opp. at 7–8.

[104] See Mega Varlik's Opp. to Transfer Mot. (arguing that service was effected abroad pursuant to Fed. R. Civ. P. 4(f)(3)); Ayasli's Mot. for Leave to Serve Mega Varlik via E-mail (doc. no. 29); Jan. 22, 2020 Order granting Ayasli's motion.

Varlik.'"[105] Ayasli does not elaborate on what "control" he contends Korkmaz exercises

over Mega Varlik, and cites only his complaint for this proposition.[106] Mega Varlik has

offered evidence, in the form of a declaration from Mega Varlik's CEO, Çalğar Şendil,

disputing this allegation of control.[107] Ayasli may not carry his burden through

unsubstantiated complaint allegations in the face of evidence to the contrary. See

Barantsevich v. VTB Bank, 954 F. Supp. 2d 972, 981–82 (C.D. Cal. 2013) ("To satisfy

his burden, a plaintiff can rely on the allegations in his complaint to the extent they are

not controverted by the moving party. If defendants adduce evidence controverting the

allegations, however, the plaintiff must come forward with facts, by affidavit or

otherwise, supporting personal jurisdiction.") (internal quotations and citation omitted).

Ayasli next argues that Mega Varlik has the requisite minimum contacts with the

United States through non-party alleged co-conspirator Jacob Kingston, a United States

citizen who resides in the United States.[108] Citing to Kingston's testimony in the Utah

prosecution, Ayasli observes that Kingston was "the Chairman of the Board of . . . Mega

Varlik and admits to owning over 99% of the company's shares during the relevant time

period."[109] Unlike the corporate Korkmaz defendants, however, Mega Varlik does

---

[105] Consolidated Opp. at 8 (quoting Compl. ¶ 42).

[106] Id.

[107] Second Şendil Decl. in Supp. of Mot. to Dismiss (doc. no. 68-1) ¶¶ 4–5.

[108] Consolidated Opp. at 9.

[109] Compl. ¶¶ 87, 89; Miller Decl. Ex. II-D at Consolidated Opp. App. 72–73.

dispute whether Kingston's ownership of the company alone suffices to render his contacts with the United States into Mega Varlik's for personal jurisdiction purposes.[110] And while "a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there," Daimler AG v. Bauman, 571 U.S. 117, 135 n.13 (2014), Ayasli points to no specific action that Mega Varlik directed Kingston to take in the United States, let alone any related to his claims.

The only facts that Ayasli offers in support of Kingston acting on behalf of Mega Varlik are the fact of his ownership and that "Kingston established Mega Varlik and deposited $25 million of the funds from the U.S. fuel tax credit scheme into a bank account in Turkey to become the owner of Mega Varlik."[111]  According to Mega Varlik, however, "Kingston is not involved in the day to day operations and decisions of the company, which fall to" Şendil, its CEO.[112]  And Ayasli only alleges one action by Mega Varlik giving rise to his claims:  that Mega Varlik called for immediate repayment of a debt it purchased from a bank in Turkey[113] which is not an action taken in the United States.  Ayasli has offered no authority for the proposition that ownership of a foreign corporation, taking no action here, by a United States resident in and of itself creates the minimum contacts necessary to satisfy due process.

---

[110] Mega Varlik's Reply in Supp. of Mot. to Dismiss (doc. no. 68) at 7–8.

[111] Consolidated Opp. at 9.

[112] Second Şendil Decl. ¶ 6.

[113] Consolidated Opp. at 9 & n.8

Finally, Ayasli contends that the actions of Mega Varlik's co-conspirators satisfy the minimum contacts requirement "under the co-conspirator theory of personal jurisdiction."[114]  Like the First Circuit Court of Appeals, that of the Ninth Circuit has not adopted the conspirator theory of personal jurisdiction and, in fact, has noted the "great deal of doubt surrounding the legitimacy of this conspiracy theory of personal jurisdiction."  Chirila v. Conforte, 47 F. App'x 838, 842 (9th Cir. 2002).

In conclusion, Ayasli has demonstrated that the United States District Court for the Central District of California may exercise personal jurisdiction over defendants Akol, SBK Holdings USA, and the Korkmaz defendants, and so the court proceeds to the venue analysis with respect to those defendants to determine whether transfer is appropriate.  He has not, however, carried his personal-jurisdiction burden as to Mega Varlik in the United States.  His claims against Mega Varlik, therefore, must be dismissed.

## 2.    Venue

"[F]or purposes of the transfer statute, a court lacks jurisdiction if venue does not lie."  Rodriguez-Roman, 98 F.3d at 424.  "Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws . . . ."  Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas, 571 U.S. 49, 55 (2013).  Under those laws, a civil action may be brought in:

---

[114] Id. at 9–10.

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).  Ayasli argues that venue is proper in California under the second of these circumstances, relying on the same series of actions and contacts with California addressed above under the jurisdictional analysis.[115]  Those actions fail to support jurisdiction over the Korkmaz defendants and Mega Varlik in California, and are likewise unlikely to support venue.

But venue would still be proper in California under § 1391(b)(3).  As discussed supra Part V.B.1.a, the court in California may exercise jurisdiction over Akol and SBK Holdings USA.  And the only other district in which any party has suggested personal jurisdiction may lie is the Southern District of New York, which Ayasli argues may exercise personal jurisdiction over the Korkmaz defendants under tag jurisdiction.[116]

Notably, the Korkmaz defendants and Mega Varlik do not dispute proper venue in California under § 1391(b).  They argue only that venue is improper in California because of the BoraJet Agreement's forum selection clause and under the doctrine of forum non conveniens.  As to the first, the Supreme Court has made clear that "[w]hether

---

[115] See Mot. to Transfer Mem. at 10–11.

[116] E.g., Opp. to Korkmaz Defendants' Mot. to Dismiss at 25–26, 28 n.4.

venue is 'wrong' or 'improper'" in the transfer context "depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause." Atlantic Marine, 571 U.S. at 55. "Whether the parties entered into a contract containing a forum-selection clause has no bearing on whether a case falls into one of the categories of cases listed in § 1391(b)." Id. at 56.

Nor does the doctrine of forum non conveniens. That doctrine, instead, "presupposes at least two forums in which the defendant is amenable to process" and "furnishes criteria for choice between them." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 506–07 (1947). While the defendants' forum non conveniens arguments may have some bearing on whether transfer is in the interest of justice, they do not preclude a finding of proper venue in California.

### C.    Interest of justice

Section 1631 creates "a presumption—albeit a rebuttable one—in favor of transfer" through the apparently contradictory use of the word "shall" and the invocation of "the interest of justice." Britell, 318 F.3d at 73. But the "conclusion that § 1631 permits transfer where personal jurisdiction is lacking does not mean the [plaintiff] automatically gets [his] requested transfer," because the court must still "determine[ ] whether transfer is 'in the interest of justice . . . .'" Fed. Home Loan Bank, 821 F.3d at 119. For example, the interest of justice may "exempt from the transfer mandate those cases in which transfer would unfairly benefit the proponent, impose an unwarranted

hardship on an objector, or unduly burden the judicial system[.]  In conducting its inquiry into the presence or absence of such factors, a putative transferor court must consider the totality of the circumstances."  Britell, 318 F.3d at 74 (internal citations omitted).

Ayasli contends that the interest of justice requires transfer to California solely "because numerous non-party coconspirators, witnesses, and entities with relevant discoverable material are located in or near California."[117]  All of the moving defendants counter that transfer will only serve to delay resolution of their motions to dismiss on forum non conveniens grounds.[118]  The Korkmaz defendants also argue that transfer would not serve the interest of justice because the case should be dismissed in light of the BoraJet Agreement's forum-selection clause.[119]  And Akol argues that transfer only adds delay in resolving the merits of his motion to dismiss for failure to state a claim, thus failing to serve the interest of justice,[120] though acknowledges that this court is no longer in a position to resolve those.[121]

The court is sympathetic to the parties' desire to resolve this case in a single jurisdiction and on issues already presented to this court.  As explained supra, however,

---

[117] Mot. to Transfer Mem. at 11–12.

[118] Akol's Opp. to Transfer Mot. at 4; Korkmaz Defendants' Opp. to Transfer Mot. at 14–15; Mega Varlik's Opp. to Transfer Mot. at 11; Korkmaz Defendants' Surreply to Transfer Mot. (doc. no. 65) at 2–5.

[119] Korkmaz Defendants' Opp. to Transfer Mot. at 14–15.

[120] Akol's Opp. to Transfer Mot. at 2.

[121] Id. at 3.

once the court determines—as it has here—that it lacks personal jurisdiction over the defendants, the Supreme Court's decision in Sinochem mandates either dismissal or transfer. The court may not address the merits of Akol's Rule 12(b)(6) argument or evaluate whether the BoraJet Agreement's forum selection clause requires Ayasli to litigate in Turkey.

Korkmaz has argued that this has been a lengthy, expensive, and inefficient process that should end with dismissal rather than transfer to a new jurisdiction. But the length of time that it took Ayasli to serve all parties, the judicial inefficiency of splitting this case among multiple fora, and the inefficiency of requiring the plaintiff to litigate in multiple fora nudge the interests of justice toward transferring Ayasli's claims against parties over whom California may exercise jurisdiction instead of wholesale dismissal on jurisdictional grounds.

## VI.  <u>Conclusion</u>

This court lacks personal jurisdiction over the Korkmaz defendants, Akol, or Mega Varlik under any of the plaintiff's theories. Because this action could not have been brought against Mega Varlik in the United States District Court for the Central District of California, the court dismisses Ayasli's claims against that defendant. But because Ayasli could have brought his claims in that court against Akol and the Korkmaz defendants, and transfer is in the interest of justice, the court grants his motion to transfer venue in part. In summary:

- Akol's and the Korkmaz defendants' motions to dismiss[122] are DENIED without prejudice to raising their forum nonconviens arguments in a court that possesses personal jurisdiction.

- Mega Varlik's motion to dismiss[123] is GRANTED.

- Ayasli's motion to transfer this action[124] is GRANTED-IN-PART and DENIED-IN-PART.  Specifically, it is GRANTED as to Ayasli's claims against Akol, Korkmaz, Bugaraj, and SBK Holdings A.S., and DENIED as to Ayasli's claims against Mega Varlik and the defaulted parties.

Accordingly, the clerk shall transfer this action as against the Korkmaz defendants and Fatih Akol to the United States District Court for the Central District of California. Ayasli's claims against Mega Varlik are dismissed.

**SO ORDERED.**

Joseph N. Laplante
United States District Judge

Dated:  July 27, 2020

cc:    Robert H. Miller, Esq.
       Chloe F. Golden, Esq.
       Patrick J. Queenan, Esq.
       Steven T. Cottreau, Esq.

---

[122] Doc. nos. 19, 40.

[123] Doc. no. 47.

[124] Doc. no. 54.

Bruce W. Felmly, Esq.
Andrew Ryan Hamilton, Esq.
Huseyin Alper Tosun, Esq.
Michael A. Delaney, Esq.
Nafiz Cekirge, Esq.
Harvey J. Wolkoff, Esq.
Joseph D. Steinfield, Esq.
Sean O'Neill, Esq.
Arnold Rosenblatt, Esq.
Kathleen M. Mahan, Esq.